IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| G. G. A., | : | |
|     **Plaintiff,** | : | |
| v. | : | Case No. 5:20-cv-00197-CHW |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | Social Security Appeal |
|     **Defendant.** | : | |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals. For the reasons discussed below, the Commissioner's decision is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for SSI benefits in August 2014, alleging disability due to back and heart problems, arthritis, anxiety, depression, attention deficit hyperactivity disorder, bipolar disorder, and depression. (R. 203). After Plaintiff's application was denied initially and on reconsideration at the state agency level of review (Exs. 1B, 4B), Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a hearing in December 2016 (R. 88–130), and then issued a first unfavorable opinion in March 2017. (Ex. 5A). In March 2018, however, the Appeals Council remanded Plaintiff's case because the ALJ gave insufficient grounds to discount Plaintiff's credibility. (R. 199).

1

On remand, the ALJ conducted a second hearing in August 2018 (R. 45–86), and then issued a second opinion (R. 10–24), again finding that Plaintiff was not disabled within the meaning of the Social Security Act. Plaintiff subsequently sought further review before the Appeals Council, but this time, the Appeals Council declined review in Plaintiff's case. Plaintiff now seeks judicial review before this Court pursuant to sentence four of 42 U.S.C. § 405(g). Plaintiff formulates her statement of the issues as "whether the Commissioner failed to properly formulate a mental residual functional capacity." (Doc. 17, p. 1). As discussed below, the ALJ properly considered both Plaintiff's mental and physical functionality, and substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled. Accordingly, the Commissioner's decision is affirmed.

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

The medical record in this case begins in May 2011, when Plaintiff sought care at the Gulfport Memorial Hospital for radiating lower back pain. (R. 459). An x-ray study revealed only mild degeneration at multiple vertebral sites. (R. 462). Plaintiff was instructed to forebear lifting weights of over twenty pounds for four days, and to "Back rest for 1-2 days." (R. 461).

Thereafter, in late 2012, Plaintiff sought care at The Medical Center of Central Georgia for radiating lumbar pain (R. 894), for which Plaintiff received injections of Decadron and Toradol along with instructions to perform lumbar stretches, to remain conscious of her posture, and to use ice packs as needed. (R. 909–13). Plaintiff also received short-term prescriptions of Flexeril, Prednisone, and Ultram. (R. 908).

The next available medical records document Plaintiff's treatment at the River Edge Behavioral Health Center. A note from January 2013 records that Plaintiff "[a]dmit[ed] to smoking

THC daily … to help w/her back pain and sleep," and that Plaintiff was "currently homeless [and] has been living at the Salvation Army." (R. 464). Plaintiff was diagnosed with bipolar disorder (R. 489) and prescribed Zyprexa (R. 481). Later, in September 2014, Plaintiff also received mental health treatment from the Phoenix Center. An intake note records that Plaintiff's son, then eight years old, was "very destructive and aggressive towards others," and that Plaintiff had "[l]ost job due to son['s] behaviors [and] having to leave work all the time." (R. 515).

In the interim, in July 2014, Plaintiff returned to the Medical Center for treatment relating to complaints of hip and radiating lower back pain. (R. 1570, 1577). Imaging studies revealed no hip or knee abnormalities (R. 1567, 1596), but they did confirm the presence of mild to moderate spinal degeneration, along with mild stenosis at the L3-4 and L4-5 vertebral sites. (R. 1611, 1613–14). In addition to these imaging studies, a nerve conduction study provided evidence for "mild generalized sensorimotor peripheral neuropathy bilaterally." (R. 1585). The record indicates the Plaintiff had trouble filling her prescriptions (R. 1589), and sources at the Medical Center opted to treat Plaintiff in the form of steroidal injections. (R. 1579).

In late 2014, Plaintiff returned to River Edge with reports of depression. (R. 548). Plaintiff was not then taking her prescribed medications. (R. 548, 570). Treating sources rated Plaintiff's condition as "level 2," meaning that she suffered either from two or more minor problems or from one stable, chronic illness. (R. 572). Contemporaneously, Plaintiff sought care for her lower back pain at Macon Orthopedics and Integrative Sports Medicine, where Plaintiff declined further treatment with steroidal injections. (R. 532).

In December 2014, Plaintiff had a consultative examination performed by Dr. Brian Chadwick. (Ex. 5F). Dr. Chadwick found that due to her lumbar spinal problems, Plaintiff would have "mild to moderate limitations with sitting," "moderate to severe limitations with standing and

4

walking," and "severe limitations with lifting and carrying weight," but "no manipulative limitations on reaching, handling, feeling, grasping, fingering." (R. 542–43).

In February 2015, Plaintiff sought treatment at First Choice Primary Care for lower back pain, for which Plaintiff was advised to consult with a pain specialist. (R. 619). Plaintiff also returned to River Edge for mental health treatment associated with a drug-related incident. (R. 596). *See also* (R. 607) ("detox from opiates"). Records indicate that Plaintiff was "[a]ble to maintain concentration," but that her mood was depressed and irritable. (R. 584). Plaintiff further reported that "her meds seem to be working for her." (R. 607). Contemporaneously, Plaintiff also returned to the Medical Center for treatment relating to a mammogram screening (R. 666), a sore throat (R. 668), and a bladder infection (R. 745).

In August 2015, Plaintiff returned to The Medical Center based on chest pain and reported syncopal episodes. (R. 989, 994). On examination, Plaintiff was found to have "5/5 muscle strength in all extremities," "[n]ormal muscle bulk and tone," and "[f]ull range of motion in all extremities." (R. 997). An electroencephalogram (EEG) study revealed "no indication of epilepsy or ictal runs," (R. 1100), but cardiological imaging revealed evidence of an "[a]bnormal myocardial perfusion." (R. 1102). The medical record indicates that Plaintiff's syncopal episodes subsided through treatment with Metoprolol. (R. 1410). Subsequently, in December 2015, Plaintiff returned to The Medical Center with complaints of bronchitis (R. 916–17), as well as lower-extremity edema attributed to possible deep vein thrombosis. (R. 921–23). Subsequently, in December 2015 and January 2016, Plaintiff received care at the Spine Care & Pain Management clinic, where sources recorded Plaintiff's reports that her pain was "aggravated by walking but is relieved by resting." (R. 1119).

Beginning in February 2016, Plaintiff sought care at Georgia Heart Physicians for hypertension and associated cardiological problems, for which Plaintiff was encouraged to exercise and to maintain a low sodium diet. (R. 1561). In March 2016, Plaintiff reported to The Medical Center with complaints of chest pain associated with diarrhea. (R. 1287, 1323). In June 2016, Plaintiff returned to The Medical Center after suffering an episode of dizziness. (R. 1168). On intake, Plaintiff reported "no back pain, no muscle pain, [and] no joint pain." (R. 1169). Lab studies revealed unremarkable findings (R. 1173), and the record indicates uncertainty as to the cause of Plaintiff's dizziness. *See* (R. 1173) ("found to be hypotensive"), (R. 1183) ("neurocardiogenic syncope"), (R. 1189) ("Syncope of unclear etiology"), (R. 1192) ("Probable transient ischemic attack").

Plaintiff also continued to treat, during this period, with Dr. James Shields at the Spine Care & Pain Management clinic. (Ex. 19F). Dr. Shields' notes record some signs of "improved responses," such as findings that Plaintiff did not have decreased range of motion, joint stiffness, joint swelling, leg cramps, weakness, or myalgia in her extremities. (R. 1626–27). Dr. Shields' records also show a persistent concern over Plaintiff's management of narcotic medications, resulting in repeated compliance warnings, (R. 1627), and eventually in Plaintiff's discharge from care in November 2016. (R. 1622). Records from The Medical Center dated December 2016 similarly suggest a "positive opiates drug hold" in conjunction with Plaintiff's treatment for abdominal pain. (R. 1699).

In January 2017, Plaintiff sought primary care after going "up to 14 days without having a bowel movement." (R. 1652). Plaintiff was encouraged to increase her water intake and to treat with docusate. (R. 1653). In May 2017, Plaintiff sought care from Gastroenterology Associates of Central Georgia, LLC, for abdominal pain partly attributed to constipation, as well as for "narcotic

induced" nausea and vomiting. (R. 1723). Plaintiff also, in June 2017, sat for the surgical removal of a small colon polyp. (R. 1720, 2004). A follow-up abdomen and pelvis CT study obtained in November 2017 revealed nothing of note. (R. 1739).

River Edge treatment records from throughout this period record that Plaintiff's memory was "grossly intact," that she had a "congruent" mood, and that she had a "coherent" thought process. (R. 1434–35, 1452–53, 1780, 1800). The River Edge records also indicate that Plaintiff's gait and posture were within normal limits or "WNL." (R. 1470). Plaintiff repeatedly was instructed on the importance of "schedule[ing] her next [appointment] before she is scheduled to run out of meds," (R. 1446, 1464, 1793, 1806), and on the importance of "taking meds as prescribed." (R. 1763, 1746, 1786). The final available medical records dating from September 2018 consist of notes recording Plaintiff's treatment for a cough (R. 1963), as well as discharge instructions from The Medical Center, where Plaintiff seemingly sat for a successful pacemaker implantation procedure. (Ex. 28F).

## DISABILITY EVALUATION IN PLAINTIFF'S CASE

Following the five-step sequential evaluation procedure, the reviewing ALJ made the following findings in Plaintiff's case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 26, 2014, her application date. (R. 13). At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease, prior drug abuse, hip pain, prior neurocardiogenic syncope with implanted device, post-traumatic stress disorder, attention-deficit hyperactivity disorder, obsessive compulsive disorder, bipolar disorder, personality disorder, chronic obstructive pulmonary disease, hypertension, cystitis, and congestive heart failure. (R. 13).

At step three, the ALJ found that Plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13). Therefore, the ALJ assessed Plaintiff's RFC, and found that Plaintiff could perform sedentary work with the following exceptions:

> The claimant can lift a maximum of 10 pounds. The claimant cannot do prolonged standing and walking. She needs a cane for uneven surfaces. She can occasionally climb, balance, kneel, stoop, crouch, and crawl. The claimant should not have concentrated exposure to excessive cold. She should not work on ladders, ropes, scaffolds, or at unprotected heights and [should] perform no work around dangerous moving machinery including commercial driving. The claimant can do simple work only with infrequent interaction with the general public.
>
> (R. 14)

At step four, the ALJ noted that Plaintiff had no past relevant work. (R. 22). At step five, however, the ALJ determined that Plaintiff could adjust to the requirements of representative occupations such as microfilm document preparer, cut and paster, and addresser. (R. 23). Accordingly, based on this step five finding, the ALJ ruled that Plaintiff was not disabled within the meaning of the Social Security Act.

## ANALYSIS

Before this Court, Plaintiff formulates her overarching argument as "whether the Commissioner failed to properly formulate a mental residual functional capacity." (Doc. 17, p. 1). Plaintiff raises two supporting arguments: (1) that the ALJ's credibility finding was "conflicting and unclear," and (2) that the ALJ erred by relying on mental health treatment gaps. (*Id.*, pp. 16–17). In addition to these mental health arguments, Plaintiff also raises two arguments that better relate to physical functionality. Specifically, Plaintiff contends that (3) her reported daily activities were not the equivalent of substantial gainful activity, and that (4) the ALJ should have ordered a

consultative physical examination. (*Id.*, p. 16). For the reasons discussed below, none of Plaintiff's arguments gives cause for a remand.

First, regarding the ALJ's credibility finding, Plaintiff asserts that the ALJ's opinion is inconsistent and unclear because the ALJ both "discredits Plaintiff for her drug abuse but finds her to be in remission." (Doc. 17, p. 16). The pertinent part of the ALJ's opinion, which relates to global assessment of functioning or GAF scores, reads as follows:

> The global assessment of functioning scores are low and inconsistent with the overall evidence of record. These scores are given little weight because the record showed non-adherence with treatment and drug abuse, although the claimant was found to be in remission.
>
> (R. 22)

There is no inconsistency in the ALJ's statement. While Plaintiff's treatment records from the River Edge Behavioral Health Center show GAF scores as low as 35, these low scores correlate with earlier findings of cannabis dependence. *See* (R. 603–04). Later records from River Edge, which show higher GAF scores, state that Plaintiff's cannabis dependence was by then in remission, indicating that Plaintiff's condition had improved. *See* (R. 1438, 1456, 1761, 17). Furthermore, the ALJ also discounted Plaintiff's GAF scores due, in part, to "non-adherence with treatment" (R. 22), meaning Plaintiff's non-compliance with a prescribed dosage regimen for "high-risk narcotic medication[s]." *See* (R. 1622–24). Finally, the Court is mindful that, in general, "a GAF score may have little or no bearing on a claimant's social and occupational function." *Thornton v. Comm'r*, 597 F. App'x 604, 613 (11th Cir. 2015). For all of these reasons, the ALJ did not err in his treatment of Plaintiff's GAF scores, which in turn comprised one factor bearing upon Plaintiff's credibility as to her mental functioning.

Second, Plaintiff argues that the ALJ erred by citing mental health treatment gaps when discounting Plaintiff's credibility as to her mental functionality. The record shows, to the contrary, that the ALJ did not rely on any gap in Plaintiff's mental health treatment as a ground to discount Plaintiff's credibility.[1] The ALJ did highlight one gap in treatment lasting from October 2017 to March 2018, but the ALJ's reason for noting the gap was to explain that Plaintiff was "off medications for 5 months." (R. 21) Hence, Plaintiff's functionality during this period was not representative of her functionality when she was treating with medications such as Latuda and Cymbalta. Nothing in the ALJ's opinion suggests that the ALJ penalized Plaintiff for missing appointments due to "poor judgment," as Plaintiff contends. *Cf. Nguyen v. Chater*, 100 F.3d 1462, 1465 (1996) ("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation"). Accordingly, the ALJ committed no error.

As her third argument, Plaintiff contends that the ALJ erred by equating Plaintiff's daily activities with substantial gainful activity. The ALJ's opinion indicates only that he considered Plaintiff's reported daily activities as one factor when assessing Plaintiff's credibility regarding her physical functionality. Specifically, the ALJ noted that Plaintiff's daily activities included "prepar[ing] simple meals, wash[ing] laundry, shop[ping] for groceries, [and] tak[ing] care of her son." (R. 22). The ALJ did not err by observing some inconsistency between these tasks on the one hand and Plaintiff's testimony on the other hand that she "can't pick up anything" and could only walk for "less than 5 minutes" at a time. (R. 385, 390). *See, e.g.*, *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) ("The ALJ's RFC determination also drew on findings of an inconsistency between Moore's own testimony as to her daily activities and her claims of

---

[1] On this point, the Commissioner's brief argues that "[t]he ALJ did not, contrary to Plaintiff's argument, discredit Plaintiff based on a lack of mental health treatment," and that "Plaintiff's brief does not even cite to what language in particular shows the ALJ considered a gap in treatment." (Doc. 20, p. 8, n.4). Plaintiff filed no reply brief.

impairment"). Additionally, the ALJ also cited objective medical findings—such as findings by Dr. Brian Chadwick that Plaintiff had "a normal gait, strength, and sensation, as well as a negative straight leg raise test" (R. 22)—in concluding that Plaintiff was not as physically limited as she alleged. Substantial evidence supports the ALJ's conclusion, particularly in light of the deference owed to the Commissioner's credibility findings. *Moore v. Barnhart*, 405 F.3d at 1212 ("credibility determinations are the province of the ALJ"). Accordingly, Plaintiff's third argument also fails to provide grounds for a remand.

Fourth and finally, Plaintiff argues that the ALJ erred by failing to order a consultative physical examination, but the record in this case, which includes over 1,500 pages of medical evidence, "contain[ed] sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r*, 496 F.3d 1253, 1269 (11th Cir. 2007). Because the ALJ had sufficient information to resolve Plaintiff's disability application, the ALJ did not err by declining to order further consultative examinations. Accordingly, Plaintiff's fourth argument also fails to provide cause for a remand.

## CONCLUSION

For the reasons discussed herein, the Commissioner's decision denying Plaintiff G.G.A.'s application for disability benefits is hereby **AFFIRMED**.

**SO ORDERED**, this 7th day of September, 2021.

                                                          s/ Charles H. Weigle
                                                          Charles H. Weigle
                                                          United States Magistrate Judge